# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

|  |  |
|---|---|
| MARIANNE HANZL,<br><br>Plaintiff,<br><br>vs.<br><br>GERTRUD M. COLLIER and ROBERT L. COLLIER,<br><br>Defendants. | No. C10-4122-DEO<br><br>**REPORT AND RECOMMENDATION REGARDING PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT** |

———————————————

This matter is before me on Marianne Hanzl's motion (Doc. No. 34) to enforce settlement. Defendants have filed a resistance (Doc. No. 39). The motion has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition. I conducted an evidentiary hearing on December 12, 2012. Hanzl lives in Germany and did not attend the hearing but her attorney, Michael Jackson, appeared on her behalf. Gertrud Collier and Robert Collier (the Colliers) appeared in person with their attorney, Tod Deck. The matter is now fully submitted.

### *Factual Background*

Marianne Hanzl filed a verified complaint (Doc. No. 1) alleging fraud, breach of fiduciary duty, conversion, unjust enrichment, promissory estoppel, fraudulent misrepresentation and breach of contract against Gertrud Collier and fraudulent transfer, civil conspiracy to commit conversion and civil conspiracy to defraud against both defendants. The complaint is based on the following general allegations: Hanzl is a citizen of Germany. In March 1995, she traveled to Yuma, Arizona, to visit her long-time friend from Germany, Gertrud Collier, who resided there on a full-time basis. During the visit, Hanzl purchased a home in Yuma, Arizona, next door to

Gertrud's home. Hanzl intended to use it as a vacation home. In November 2000, Hanzl and Gertrud entered into an agreement that Gertrud would manage and lease the property on behalf of Hanzl. In March 2006, the Colliers moved to Sioux City, Iowa. Hanzl then decided to sell the Arizona property and Gertrud agreed to sell it on her behalf. To do this, they executed a special durable power of attorney to authorize Gertrud to sell Hanzl's Arizona property, collect the proceeds, and then transfer them to Hanzl. The Arizona property sold for $182,500. Gertrud did not immediately transfer the proceeds to Hanzl. Hanzl alleges she spoke to Gertrud over the phone on several occasions asking for the money and Gertrud assured her that she would get it.

In October 2006, the Colliers purchased a home at 4455 West Street in Sioux City, Iowa (the West Street property), in both of their names and then transferred ownership to the "Gertrud M. Collier Living Trust." Various tax issues arose regarding the sale of the Arizona property and Hanzl came to believe from Gertrud that once those issues were resolved, she would receive her money. When Hanzl completed paperwork to resolve the outstanding tax issues, Gertrud continued to withhold the proceeds. Hanzl then filed this lawsuit.

On April 24, 2012, the parties participated in a settlement conference with then-Chief Magistrate Judge Paul A. Zoss. *See* Doc. No. 32. At the end of the conference the parties advised Judge Zoss that the matter had been settled. Judge Zoss entered an order (Doc. No. 33) staying the case for seven months to allow the parties time to implement the settlement agreement. On October 16, 2012, Hanzl filed her motion to enforce the agreement. The Colliers filed their resistance on November 2, 2012.

### The Evidentiary Hearing

Because there was a factual dispute over the terms of the settlement, I held an evidentiary hearing. *See Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.*, 528 F.3d 556, 561 (8th Cir. 2008). Plaintiff called defendants' attorney, Tod Deck, as a witness. Plaintiff also offered Exhibit 1 (Verified Complaint), Exhibit 2 (Affidavit of Michael R.

Jackson), Exhibit 3 (Email from Tod Deck to Michael Jackson dated May 25, 2012) and Exhibit 4 (28 photographs of the West Street property).[1] All four exhibits have been admitted into evidence.

Defendants called plaintiff's attorney, Michael Jackson, as a witness along with Gertrud Collier and Robert Collier. Defendants also offered Exhibit A (a draft Stipulated Settlement Agreement prepared by their attorney), Exhibit B (Various emails exchanged between Tod Deck and Michael Jackson) and Exhibit C (Judge Zoss's order at Doc. No. 33). All three exhibits have been admitted into evidence. Both attorneys also made professional statements and presented oral arguments.

Hanzl argues that the parties settled the case for the fixed sum of $262,500 and defendants were given 180 days to raise that amount by obtaining financing or selling the West Street property. She notes that the Colliers agreed to provide (but never actually did provide) her with a deed to the property that she would hold as security during the 180-day period. If defendants did not pay the $262,500 within 180 days, Hanzl would be entitled to record the deed so she could sell the property. She argues that the net proceeds from the sale are to be applied toward the $262,500 owed by the defendants and that the defendants remain liable to her for any deficiency. She acknowledges that the defendants would be entitled to the amount of any net proceeds in excess of $262,500. Hanzl also requests attorney's fees associated with bringing this motion based on defendants' alleged bad faith and oppressive litigation conduct.

The Colliers argue the agreement gave them 180 days to pay $262,500 and, if they did not, then Hanzl would receive the West Street property in full satisfaction of their obligations under the agreement. They contend there was no requirement that they sell the property or obtain financing and they will not owe any deficiency if Hanzl does not realize $262,500 from the sale of the property.

---

[1] Defendants made a relevancy objection to Exhibit 4. I received the exhibit subject to the objection. Having now reviewed the photographs, I find that they are relevant. The objection to Exhibit 4 is overruled.

Both attorneys testified during the hearing and agreed on several basic points concerning the settlement conference. Among other things, the relevant negotiations took place during private discussions between the two attorneys. Neither Judge Zoss nor the parties were present during those discussions.[2] Thus, the Colliers' understanding of proposed and/or agreed settlement terms is based solely on information conveyed to them privately by Deck. As for Hanzl, she had authorized Jackson to negotiate on her behalf and was excused by Judge Zoss from attending the settlement conference. While Jackson communicated with her by telephone, Hanzl likewise has no direct knowledge of the negotiations.

Deck testified that at some point during the settlement conference, the Colliers offered Hanzl the deed to the West Street property in full settlement of the case but Hanzl rejected this offer. (Tr. at 9:17).[3] He did not recall whether Hanzl then demanded $262,500 immediately thereafter, but acknowledged writing the following to Jackson on May 25, 2012:

> At the settlement conference, after much back and forth regarding time to vacate, the Colliers flat out offered your client the deed to the property. You[r] client's response to that was to return with a demand of $262,500, but to allow my clients six months to attempt to obtain financing or sell the property, during which six months my clients had the right to possession of the property. . . .

Pl. Ex. 3. Deck also wrote: "I agree with you that the agreement was for my clients to give your client a deed as security for the settlement at the outset of the settlement . . . ." *Id.*

---

[2] While Judge Zoss conducted the settlement conference, both attorneys confirmed that the discussions resulting in a settlement agreement took place while he was handling a hearing in another case. Thus, he was not present during the relevant communications between counsel. As I will discuss below, the attorneys provided him with only limited information concerning the settlement terms.

[3] Citations to the transcript ("Tr.") are to the time of day of the referenced testimony, as reflected by the court's official audio recording of the December 12 hearing.

Deck testified that when his clients offered the deed he indicated to Jackson that they believed the West Street property was worth around $300,000. (Tr. 9:33). Deck recalled that Jackson expressed some concern at this point about the uncertainty of the real estate market and the value of the property. (Tr. 9:34-35).

Deck testified that his clients agreed to pay $262,500 within six months and if they were not able to do that, then Hanzl would get the property. (Tr. 9:26-27). Deck admitted that he had never explicitly communicated to Jackson that if the Colliers were not able to obtain financing or sell the house at the end of six months, Hanzl would have to accept the deed as full settlement. (Tr. 9:27). He also testified that Jackson had never explicitly stated that Hanzl would accept the deed in lieu of the fixed sum of $262,500. (Tr. 9:31). Deck stated that his clients accepted a proposal to pay $262,500 within six months, during which time they could attempt to obtain financing or sell the property. If they did not come up with the $262,500, then Hanzl would be entitled to the deed to the property. (Tr. 9:28).

Deck testified that the Colliers never placed the house on the market during the 180-day period. (Tr. 9:41). He acknowledged that Jackson requested that Hanzl be allowed to find a realtor for the house when it appeared the Colliers were doing nothing to sell it and that Hanzl had also asked to have it inspected by someone of her choosing. (Tr. 9:42-44). These conversations took place around the end of May. When asked about the 180-day timeframe, Deck testified that part of the reason for the 180-day period was to give his clients the opportunity to either sell the house or obtain financing. (Tr. 9:45). If those events did not occur, Hanzl was entitled to the property. (Tr. 9:45-46).

Deck was not familiar with any attempts the Colliers made to obtain financing. He was aware that they might have had trouble due to other encumbrances and their level of income. (Tr. 9:47). Deck knew about these issues before the settlement conference but understood that his clients were actively addressing them, which should

have resolved any problems they would have had in obtaining financing on the West Street property. (Tr. 9:49).

Jackson testified that there was discussion during the settlement conference that the Colliers would obtain financing or actively attempt to sell the property during the 180 days and would not simply be allowed to "sit" on the property during that time. (Tr. 10:11). Jackson testified there was no discussion of "deficiency" or what would happen if the property did not sell for $262,500. However, Jackson said he did express concern about not knowing the value of the property given the real estate market and the fact that he had not seen the home. (Tr. 10:12). He said this was the reason they had to have a fixed sum. Jackson elaborated that Hanzl had demanded $275,000 and the Colliers offered $250,000. He explained that after the Colliers offered the deed by itself, Hanzl rejected that offer but reduced her demand to $262,500 to split the difference. (Tr. 10:13-14). Jackson recalls that after the settlement conference, Deck was the first one to raise the issue of a deficiency. He stated this was never his concern because he expected that Hanzl would ultimately receive $262,500 and it did not matter how the Colliers came up with the money. (Tr. 10:14-15).

Exhibit B contains emails exchanged by Jackson and Deck. On May 29, 2012, Jackson wrote:

> It is in their best interest to sell the home for the most amount, as any amount exceeding $262,500 is theirs to keep and any shortfall needs to be made up by them in another fashion. Thus, I am not sure why they are not taking a more proactive approach to this matter.

Def. Ex. B at 5. Jackson testified that Deck emailed a draft stipulated settlement agreement around May 22, 2012. It states, in relevant part:

> If, during the 180 day period referred to in paragraph 1 of this agreement, Robert and Gertrud Collier are not able to secure a ready, willing, and qualified buyer for the above described real estate, do not provide a written commitment from a licensed lender, and do not otherwise pay to

6

> Marianne Hanzl the sum of $262,500, then and in that
> event, Marianne Hanzl must accept the deed executed by
> Robert and Gertrud Collier to the above described real estate
> as payment in full of the promise of Robert and Gertrud
> Collier to pay in paragraph 1 of this agreement and Robert
> and Gertrud Collier shall be relieved of any further liability
> to pay the sum of $262,500 to Marianne Hanzl, the
> conveyance of the above described real estate being in lieu
> of and as full substitution for the payment promised in
> paragraph 1 above.

Def. Ex. A, ¶ 8.

Jackson was asked about Judge Zoss's order of April 24, 2012 (Def. Ex. C), which stayed this case for seven months to allow the parties time to implement their agreement. When asked why he thought the matter was stayed for seven months, Jackson said the agreement allowed the Colliers 180 days to refinance or sell the home, and the case was stayed for an extra 30 days to accomplish that purpose. (Tr. 10:22-23).

Gertrud Collier testified that she and her husband vacated the West Street property in late October 2012 as required by the settlement agreement. (Tr. 10:27). She stated the settlement agreement allowed them time to stay in the house until a particular date, during which time they could sell or mortgage the property to obtain the money, and they could either pay the money or turn over the deed. (Tr. 10:28). She did not believe she was responsible for paying any deficiency or additional money if the property did not sell. *Id.* She testified she would not have agreed to turn over the deed and then pay any shortfall between $262,500 and the proceeds Hanzl receives from selling the house. She stated that under such an agreement, Hanzl could sell the house for a dollar to her son, and Gertrud would be responsible for coming up with the remainder in cash. (Tr. 10:32). Gertrud did not recall details of the offers exchanged during the settlement conference, such as the deed by itself or payment of $275,000,

but she clearly remembered the terms they concluded with: $262,500 or the property. (Tr. 10:42-44).

Gertrud testified that during the 180-day period the Colliers spoke to a realtor who told them he could list the property and perform a quick sale, but the Colliers chose not to pursue this option. (Tr. 10:45). She remembered the realtor said he thought he could sell the property for $279,000. (Tr. 10:46). She also recalled talking to the realtor about associated costs of the sale and to her husband about what the net proceeds would be from the sale. However, she said the numbers were never very precise and these discussions were never "serious" because it was early in the process and they did not see a reason to go forward with a quick sale. (Tr. 10:47). Gertrud said she had tried to contact another realtor at some point, but never got a response.

When asked about Exhibit 4, the photographs of the West Street property, Gertrud acknowledged that there is currently no refrigerator, dishwasher, oven, stove, microwave, washer or dryer in the house and stated that those items are in storage. (Tr. 10:51-52; 55). She admitted the carpet is stained in the basement and in a smaller room upstairs. (Tr. 10:52). She also admitted several items were left in the house such as cleaning materials, packing paper, and various items strewn on the floor in the basement, but she also pointed out they had left a piano and computer desk behind. (Photo 15; Tr. 10:53). She admitted the bathrooms did not look clean and various bottles of cleaners were left on the countertops. (Tr. 10:55). She indicated that she did not do anything to intentionally affect the value of the property. (Tr. 10:59).

Robert Collier testified that his understanding of the settlement agreement was that they could sell the property, get a loan, or give Hanzl the property after 180 days. (Tr. 11:01). He did not believe they would owe any money if the property sold for less than $262,500. *Id.* He also testified about various attempts he had made to obtain financing in order to settle this case before the settlement conference. He tried to obtain loans and he offered deeds to Hanzl for other properties he owned in Arizona as part of previous settlement negotiations. (Tr. 11:03). Robert testified that throughout

8

the settlement negotiations, he indicated he could not pay the amounts Hanzl was demanding. He testified that eventually he thought they should just give Hanzl the deed to the West Street property at the settlement conference. (Tr. 11:04). He said Hanzl did not accept it, and the next offer he remembers was $262,500 by Hanzl. He said his response was that he still could not pay this amount, but if she would accept the deed to the house, and give them time to vacate or sell the house, they would have an agreement. *Id.*

Robert also testified about attempts he had made to obtain financing after the agreement was reached. His loan requests were denied on two occasions due to other debt and he also discovered he had been the victim of identity theft. (Tr. 11:04-05). Once he had resolved the identity theft issues, time had run out and they had to vacate the property. He confirmed Gertrud's testimony that they spoke to a realtor after the settlement conference who discussed a quick sale of the West Street property and thought it could be listed for $279,000. (Tr. 11:26). He said they declined the quick sale offer. He admitted that he became aware at this time that if they sold the property the net proceeds would fall short of the settlement amount. (Tr. 11:27).

Robert testified that he was familiar with Defense Exhibit A, the stipulated settlement agreement drafted by Deck. (Tr. 11:06). He said the document set out the terms of the agreement as he understood them. He remembers discussing the draft with Deck after it was sent to Jackson. (Tr. 11:07). Robert testified that he would not have agreed to make up for any deficiency after giving Hanzl the deed. (Tr. 11:08). He explained that he could not afford to pay $262,500 in the first place, but they agreed that if he could not pay it in time, then Hanzl could have the deed and that was all. *Id.* He also testified that he had never discussed with anyone what would happen if the property did not sell for $262,500. (Tr. 11:11).

Robert admitted that he did not know the value of the house in April 2012, just that he had paid $289,000 for it six years earlier. (Tr. 11:12). He testified he had assumed it was worth more than that amount due to improvements such as a chicken

coop, new gates, water heaters, barn insulation, new roofing on the house and garage, and installation of radon detectors. (Tr. 11:13-14).

Robert recalled that at one point during the settlement conference Hanzl demanded $275,000 and they offered $250,000. (Tr. 11:15-16). He acknowledged that Hanzl later reduced her demand to $262,500 but stated it came with the additional term of giving the Colliers the opportunity to sell the property or get a loan, otherwise Hanzl would get the deed free and clear. (Tr. 11:16-17). Robert stated that he remembered the parties agreeing to $262,500 and the Colliers would have 180 days to pay. (Tr. 11:17). He testified that as Deck explained Hanzl's offer to him during the settlement conference, he did not believe he could simply wait out the 180 days and then give Hanzl the property. He understood that the Colliers would have to try to sell the property or get a loan or mortgage during the 180-day period. (Tr. 11:18). He believed he was required to take some steps to sell the property. *Id.*

Because the discussions that resulted in an agreement were conducted privately between the two attorneys, I asked each to describe in his own words the terms of the final offer that was accepted at the end of the settlement conference. Jackson stated, "We would have to have a fixed sum, which was $262,500, and they would have 180 days to raise the money, otherwise we would begin the process of selling the home." (Tr. 9:54). Deck stated that Jackson told him "my client would agree to $262,500, allow your clients six months to try to come up with those funds, and if not, she would be entitled to the property." (Tr. 9:54-56). Deck clarified that he remembered it being a brief discussion. He said they did not talk about other terms and there was no mention of a requirement of obtaining financing or selling the property. (Tr. 9:55). Deck said after he had discussed Hanzl's offer with his clients he told Jackson something to the effect of "my clients will agree to $262,500 within six months, otherwise your client gets the property." (Tr. 9:56). Jackson recalls Deck indicated they would accept the offer of $262,500 and they would have six months to vacate the

property.  Jackson said there was never any discussion that at the conclusion of 180 days, the deed would simply suffice in lieu of the money.  (Tr. 9:57).

I also asked the attorneys to describe what they told Judge Zoss after the settlement was reached.  Deck said he summarized the terms of the agreement to Judge Zoss, which were that his clients would have six months to pay $262,500 and if not, then Hanzl would get the property.  (Tr. 9:58).  Jackson's recollection is somewhat different.  He remembers Judge Zoss asking if they had settled the matter and they said they had, but they were allowing the Colliers six months to raise the money.  Jackson stated that additional terms were not discussed with Judge Zoss.  (Tr. 9:58).  Deck recalled Judge Zoss saying something to the effect of "your clients have the opportunity to save their house, and your client gets the money."  (Tr. 9:59).  Jackson did not have specific recall of this comment but said it is consistent with his recollection of the conversation.

### Arguments of Counsel

Jackson points out that Hanzl consistently refused to accept real estate in full settlement of her claims due to risks and uncertainty as to property values.  Before the settlement conference, she rejected an offer of certain Arizona properties.  During the settlement conference, she rejected an offer of the West Street property.  Instead, she demanded payment of a fixed sum.  The parties ultimately agreed on $262,500, which split the difference between Hanzl's previous demand of $275,000 and the Colliers' previous offer of $250,000.  Jackson argues that based on this history of negotiations, it would have made no sense for Hanzl to agree to accept a deed to the West Street property after 180 days in full satisfaction of all claims.  He contends the sole purpose of the 180-day provision was that Hanzl wanted to give the Colliers a chance to save their home based on their past relationship as friends.  Thus, while she demanded payment of $262,500, she was willing to give the Colliers some time to find a way to raise that amount without losing their house.  Jackson argues that the issue of a possible

11

deficiency only came up after the Colliers realized that the house could not be sold at a price high enough to net $262,500.

Deck argues Jackson was the first to raise the issue of a deficiency when he realized that a sale of the West Street property would not net $262,500. Deck also contends that he sent the draft settlement agreement to Jackson before the Colliers were advised by a realtor that they should list the house for only $279,000. He notes that his draft agreement is consistent with the Colliers' position concerning the terms of settlement. He also points out that overage was discussed, but never deficiency.[4] Part of the reason for this was because the Colliers never had the ability to pay a settlement amount in cash. He states that if they had agreed to pay a fixed sum, they could have done so without agreeing to give up their house.

## *Analysis*

Basic principles of contract formation govern the existence and enforcement of an alleged settlement. *Chaganti & Associates, P.C. v. Nowotny*, 470 F.3d 1215, 1221 (8th Cir. 2006), *cert. denied*, 551 U.S. 1131 (2007). The parties agree that Iowa law applies in this case. *See also Barry v. Barry*, 172 F.3d 1011, 1013 (8th Cir. 1999) (stating a settlement contract must be construed according to state law in a case based on diversity jurisdiction). In order to be bound, the contracting parties must manifest their mutual assent to the terms sought to be enforced. *Sierra Club v. Wayne Weber L.L.C.*, 689 N.W.2d 696, 702 (Iowa 2004) (citing *Kristerin Dev. Co. v. Granson Inv.*, 394 N.W.2d 325, 331 (Iowa 1986)). Mutual assent is determined by objective evidence. *Schaer v. Webster Cnty.*, 644 N.W.2d 327, 336 (Iowa 2002). "The cardinal rule of contract interpretation is to determine the intent of the parties at the time they entered into the contract." *Peak v. Adams*, 799 N.W.2d 535, 544 (Iowa 2011). "Evidence of the parties' mutual intent is what matters." *Id.* (emphasis in original).

---

[4] In rebuttal, Jackson emphasized that because overage was discussed and deficiency was not, this indicates the settlement was predicated on a fixed sum.

To determine intention, the court looks to "what the parties did and said, rather than some secret, undisclosed intention they may have had in mind or which occurred to them later." *Id.* (quoting *Waechter v. Aluminum Co. of Am.*, 454 N.W.2d 565, 568 (1990)). "[T]he situation and relation of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein . . . and the course of dealing between the parties" are all relevant in determining intention. *Id.* (quoting *NevadaCare, Inc. v. Dept. of Human Servs.*, 783 N.W.2d 459, 466 (Iowa 2010)). "When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence, the question of interpretation is determined by the finder of fact." *Id.* (quoting *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008)).

It is undisputed that there are two definite terms of the settlement agreement between these parties—the amount of $262,500 and the 180-day timeframe. There is sufficient evidence that the parties manifested mutual assent to these terms. Both attorneys offered professional statements that these terms were part of the agreement, as did the Colliers. The key issue in dispute is whether the Colliers, having failed to raise $262,500 by selling or mortgaging the West Street property within 180 days, can satisfy the settlement agreement by simply giving the property to Hanzl.

Based on the evidence presented, I find that the answer is clearly "no." I find that the parties reached an oral agreement to settle the case for the fixed sum of $262,500, payable in 180 days. They further agreed that Hanzl would be entitled to the West Street property if the Colliers did not pay the settlement amount within 180 days and that she would then sell the property. The parties did not, however, agree that giving Hanzl a deed to the West Street property would fully-satisfy the Colliers' obligation under the agreement. Instead, and as Deck wrote to Jackson on May 25, 2012, the Colliers were to give Hanzl a deed "as security for the settlement." Pl. Ex.

3.[5]  The agreed settlement is for payment to Hanzl in the amount of $262,500.  Hanzl is entitled to receive nothing more and nothing less.  Just as when a secured creditor sells collateral after a default, if the net proceeds of a sale exceed the amount owed, the excess will go to the debtors (the Colliers).  But if the net proceeds are less than the amount owed, the Colliers will remain liable for the deficiency.

My finding is based in large part on two categories of undisputed evidence.  First, Hanzl rejected offers of real estate to settle her claims multiple times, including at the settlement conference, and stated that the uncertain value of the offered real estate was her reason for rejecting the offers.  Instead, she consistently demanded a sum-certain.  During the settlement conference, the Colliers offered to settle the case by giving Hanzl a deed to the West Street property and stated a belief that it was worth $300,000.  Hanzl refused this offer and again demanded a sum-certain, this time $262,500.  The evidence shows that all of Hanzl's settlement demands were for a fixed sum of money.  There is no evidence that Hanzl changed her mind late in the negotiations and agreed to accept the West Street property in lieu of a definite amount of cash.

Second, the testimony and statements of counsel make it clear that such an outcome was not discussed or agreed upon during the conversations that created the settlement agreement.  Jackson, in communicating the settlement demand that was ultimately accepted, says that he stated:  "We would have to have a fixed sum, which was $262,500, and they would have 180 days to raise the money, otherwise we would begin the process of selling the home."  (Tr. 9:54).  Deck's recollection of the demand is almost identical, as he says Jackson told him "my client would agree to $262,500, allow your clients six months to try to come up with those funds, and if not, she would be entitled to the property."  (Tr. 9:54-56).  As I noted earlier, Deck acknowledged he

---

[5] The Colliers never actually delivered a deed to Hanzl, expressing a concern through counsel that Hanzl would use it to encumber the property or sell it before the 180-day period expired. *See* Def. Ex. B.

never told Jackson that if the Colliers were not able to obtain financing or sell the house at the end of six months, Hanzl would have to accept the deed as full settlement. (Tr. 9:27). He also testified that Jackson had never stated that Hanzl would accept the deed in lieu of the fixed sum of $262,500. (Tr. 9:31). Simply put, neither attorney's version of the terms of the demand indicates that after six months Hanzl would be entitled to *only* the property, rather than the agreed settlement amount.

I have no doubt that the Colliers accepted a settlement demand that required them to pay Hanzl the fixed amount of $262,500. The West Street property was simply security for this payment. If the Colliers could not or did not raise the proceeds in six months, then they would vacate the house and Hanzl would have the right to sell it for purposes of creating a pool of money to apply toward the agreed settlement amount. Neither side proposed, let alone agreed, that this right to sell the house replaced Hanzl's right to receive $262,500.

In addition to the undisputed evidence discussed above, other factors likewise support my finding as to the terms of settlement. First, as of the date of the settlement conference Hanzl had no basis to know, or even approximate, the fair market value of the West Street property. There is no evidence that the property was appraised before the settlement conference. Nor is there any other evidence suggesting that Jackson and Hanzl could have made an informed estimate of the property's value. While the Colliers apparently stated a belief during the settlement conference that the property was worth $300,000, this case is based on an alleged breach of trust. As such, I do not believe Hanzl would have simply accepted the truth of the Colliers' stated opinion of value. No rational litigant would agree to accept property in full settlement of a claim without having some basis for at least estimating the value of that property. The Colliers' current, alleged version of the settlement terms defies basic logic.

Second, if the Colliers truly intended the terms of the agreement to provide that they could fully satisfy their obligations by simply conveying the West Street property to Hanzl after six months, they did a terrible job of communicating this proposed term.

This is especially true in light of Hanzl's rejection, immediately prior to the discussions at issue, of their offer to convey the West Street property in full settlement of this case. Because Hanzl rejected an immediate conveyance of the property to settle her claims, the Colliers could hardly assume she would accept a delayed conveyance. As such, if they intended to include such a term, it was imperative that they expressly include it in their response to Hanzl's demand. As noted above, however, Deck did not describe such a term when he communicated the Colliers' response to Jackson. The intention expressed in the words actually communicated prevails over a party's secret intentions. *See, e.g., First Northwestern National Bank v. Crouch,* 287 N.W.2d 151, 153 (Iowa 1980). Regardless of what the Colliers now claim they intended or understood, the words exchanged by the attorneys during the negotiations fail to support their position.

Third, having personally observed both of the Colliers during their testimony at the hearing, I have questions about their credibility. This is especially true with regard to Gertrud Collier. She professed to have virtually no recollection of anything that happened during the settlement conference, yet had perfect recall of what she claimed to be the final terms of settlement. In general, any details that would have been inconvenient for her to recall were forgotten, while helpful details were perfectly clear. Similarly, her responses when being asked about the recent, unflattering photographs of the West Street property (Pl. Ex. 4) were evasive and argumentative. In short, based on her demeanor and the content of her answers, I afford virtually no weight to Gertrud's testimony.

For all of the reasons discussed herein, I recommend entry of an order of specific performance in favor of Hanzl with regard to the following, agreed settlement terms: Hanzl is entitled to payment in the amount of $262,500. Because the Colliers did not make that payment in 180 days, Hanzl is entitled to a deed to the West Street

property to permit her to sell that property.[6]  If the net sale proceeds exceed $262,500, she shall pay the excess to the Colliers.  If the net sale proceeds are less than $262,500, then she shall be entitled to judgment against the Colliers for the full amount of the deficiency.

### Attorney's Fees

Hanzl requests an award of costs and attorney's fees incurred in bringing this motion.  She contends the defendants' conduct during the litigation process is "indicative of the same deceit and bad faith that necessitated the filing of this lawsuit." Pl.'s Br. at 9.  "A court has the inherent authority to assess attorney fees against a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Jaquetee v. Black Hawk Cnty., Iowa*, 710 F.2d 455, 462 (8th Cir. 1983).

At this stage of the case, I recommend that Hanzl's request for attorney's fees be denied.  As noted above, I reject the Colliers' interpretation of the settlement agreement and have concerns about Gertrud Collier's credibility.  I am also troubled by the Colliers' conduct during the 180-day period during which they had agreed to make efforts to sell or mortgage the West Street property.  However, both sides share blame in the events that necessitated Hanzl's motion to enforce the settlement agreement. While hindsight is 20/20, it is clear that both attorneys could have done a better job of memorializing the terms of settlement at, or immediately after, the settlement conference.  As such, I do not find that the Colliers acted in bad faith, vexatiously, wantonly, or for oppressive reasons, in disputing the terms of the settlement agreement.

---

[6] Every contract includes an implied covenant of good faith and fair dealing.  *See, e.g., Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681, 684 n.4 (Iowa 2001).  Thus, just as when a creditor sells collateral, Hanzl will be required to act in good faith and in a reasonable manner with regard to her sale of the West Street property.  I expect that this will include such basic steps as utilizing a licensed real estate broker and entering into an arms-length transaction with an unrelated buyer.  The court will retain jurisdiction over this case while the settlement is implemented.  As such, the Colliers will have the opportunity to seek appropriate relief if they have concerns about the transaction.

I do note, however, that this case is not over. This Report and Recommendation, if adopted, will require certain conduct by both sides, starting with issuance of a deed to Hanzl for the West Street property. If any party acts in bad faith, vexatiously or wantonly with regard to the implementation of the settlement terms, the other party is free to seek appropriate sanctions.

### *Recommended Disposition*

For the reasons discussed above, I RESPECTFULLY RECOMMEND that the plaintiff's motion to enforce settlement (Doc. No. 34) be **granted** and that the court enter an order of specific performance as follows:

1.      Based on the settlement agreement reached at the April 24, 2012, settlement conference, Hanzl is entitled to payment in the amount of $262,500 in full satisfaction of all claims against the defendants in this case.

2.      Because the Colliers did not make that payment to Hanzl within 180 days, Hanzl is entitled to a deed to the West Street property to permit her to sell that property (subject to the requirement of good faith and fair dealing as described in footnote 6, *supra*). If this Report and Recommendation is adopted, the Colliers shall deliver a fully-executed deed to Hanzl's counsel, conveying marketable title to the West Street property to Hanzl, within thirty (30) days of the entry of the order adopting this Report and Recommendation. Hanzl shall then undertake reasonable efforts to sell the West Street Property.

3.      Within 20 days after closing on her sale of the West Street property, Hanzl shall file a status report that includes a complete itemization of the gross sale price, the transaction-related expenses and the net sale proceeds. If the Colliers object to the transaction on grounds that it is not a good faith, arms-length transaction, they shall file their objections within 20 days after Hanzl files her status report and itemization.

4. Regardless of whether the Colliers file objections to the sale, if the net sale proceeds exceed $262,500, Hanzl shall pay the excess to the Colliers no later than 20 days after closing on her sale of the West Street property.

5. If the net sale proceeds are less than $262,500, judgment will be entered against both defendants, jointly and severally, for the amount of the deficiency, unless the court adjusts the amount of the deficiency based on any objections the Colliers file with regard to the sale of the property.

Finally, and for the reasons set forth above, I recommend that Hanzl's request for an award of attorney fees be **denied.**

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 9th day of January, 2013.

LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA